994 F.2d 1271
 143 L.R.R.M. (BNA) 2430, 61 USLW 2796,
125 Lab.Cas. P 10,714
 Elizabeth KINNEY, Regional Director of Region 13 of the
National Labor Relations Board, for and on Behalf
of the NATIONAL LABOR RELATIONS BOARD,
Plaintiff-Appellee,
v.
INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150,
AFL-CIO, Defendant-Appellant.
 No. 92-1919.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 7, 1993.
Decided June 1, 1993.
 
 Linda McCormick, Librado Arreola, N.L.R.B., Chicago, IL, Ellen A. Farrell, Corinna L. Metcalf, (argued), N.L.R.B., Injunction Litigation Branch, Washington, DC, for Elizabeth Kinney.
 Louis E. Sigman, Dale D. Pierson, argued, Pasquale A. Fioretto, Baum & Sigman, Chicago, IL, for International Union of Operating Engineers, Local 150, AFL-CIO.
 Stephen M. Maish, Patrick A. Mysliwy, Maish & Mysliwy, Hammond, IN, for Heckett Employees, amicus curiae.
 William Bevan, III, Pittsburgh, PA, for Heckett Div. of Harsco Corp., amicus curiae.
 Before CUMMINGS and KANNE, Circuit Judges, and EVANS, Chief District Judge.*
 CUMMINGS, Circuit Judge.
 
 
 1
 The district court has enjoined Local 150 of the International Union of Operating Engineers, AFL-CIO, from holding a mass trial to discipline some fifty-three members who, the Union claims, crossed picket lines during a strike. 786 F.Supp. 1431. The National Labor Relations Board ("Board")[1] urges us to uphold the injunction but argues that the district court applied an incorrect standard for considering its petitions for equitable relief. The Board claims this standard will make it more difficult in future cases for the Board to halt unfair labor practices. The Union, by contrast, contends that the district court used the right standard but applied it wrongly; it wants to sanction without delay members described in one Union newsletter as "LOWER THAN GUTTERSNIPES, UNION BUSTING CRAWLING SCUMBAGS" (defendant's app. at 8). Because we find that the district court used the correct standard and applied the standard judiciously in this case, we uphold the injunction.
 
 I.
 
 2
 This disagreement between the Union and its membership has a curious twist in that the employees who allegedly crossed picket lines work for the competitor of the company targeted by the strike. The strike, from October 12 to October 18, 1991, was aimed at Edward C. Levy Co. ("Levy"), which is located on the same premises as the Heckett Division of Harsco Corp. ("Heckett"). The employees accused of violating the picket line work for Heckett. Both firms are slag processors; that is, they reclaim a waste product in the manufacture of steel. As raw materials are converted first to pig iron and then to finished steel, a waste product is drawn off in molten form, cooled until it hardens, broken up, scavenged for metals, and disposed of; this is slag. Levy and Heckett are subcontractors for the processing and disposal of slag at LTV Indiana Harbor Works ("LTV"), a steel manufacturer which owns the plant in East Chicago, Lake County, Indiana, that is at the center of this dispute.
 
 
 3
 When the Union went on strike against Levy, Heckett employees were obliged to continue working under a separate collective bargaining agreement good through the end of September 1995. According to that agreement, "[t]here shall be no strikes, work stoppages, slow down, interruption, or impeding of work during the period of this Agreement" (defendant's app. at 3). The LTV plant is large--some 5,000 workers on 1,150 acres--and has three entrances. Ordinarily, two entrances are used for employees and one for contractors. As in a previous labor dispute, the companies designated one entrance to serve the struck firm exclusively, here Levy. The other two gates were reserved for LTV and its outside contractors, including Heckett, and signs posted at the various gates warned that all traffic related to Levy was required to use the Levy entrance. This so-called reserved gate system was intended to allow Heckett, LTV and all others at the plant to go about their business normally without having to cross picket lines. Use of a reserved gate system is common where employers share a site but only one is experiencing labor strife, and is designed to keep neutral parties from being dragged into the dispute. Mautz & Oren, Inc. v. Teamsters, Chauffeurs, And Helpers Union, Local No. 279, 882 F.2d 1117, 1122 (7th Cir.1989).
 
 
 4
 According to testimony before the district court, an LTV representative approached Union officials on October 12, the first day of the strike, and told them to picket only at the Levy entrance. The Union's picket captain allegedly responded that he had been instructed to picket each of the three gates, and that the Union intended to disrupt the work of all contractors at the East Chicago site, not just Levy. Indeed, the Union continued to post placard-bearing workers at the three entrances to the facility. Local 150 now claims that it was never told of the reserved gate system and that the signs were not visible from the areas where the disgruntled workers were protesting. The district judge, however, made a factual finding that the signs were in place and, apparently, visible.[2]
 
 
 5
 During the strike some fifty-three Heckett employees entered the Indiana Harbor Works plant through the two gates designated for non-Levy traffic. Local 150 filed internal Union charges against some of them on October 14, 1991, or the third day of the strike. The Union then scheduled a "mass trial" for the Heckett workers for December 12, 1991 (defendant's app. at 7). According to testimony in the district court, a Union member who is found guilty in such a proceeding may be fined as much as $5,000 and expelled from the Union. A worker booted out of the Union may also lose her job because a "top card" issued by Local 150 is required to run certain Heckett equipment. A censured employee is able to appeal a sanction to the International Union only after paying the fine. As a consolation prize, members who lose their top cards and their jobs may still pay a fee and get on the Union's out-of-work list while they appeal their punishment.
 
 
 6
 The atmosphere between Local 150, Levy, and Heckett's employees during the strike was poisonous. Several Heckett workers filed charges with the Board against their Union. One of these testified in district court that his tires were slashed and his family threatened. And a Union newsletter bitterly castigated Heckett employees who honored their contract and continued to work:
 
 
 7
 I cannot think of a defense for these guys. Had the situation been reversed, they would have expected a show of support from their fellow Union members. The strike was supported by union members of other trades, but not by members of 150, the trade involved. What an embarrassment they are to the remaining thirteen thousand some hundred members of Local 150!!!! EVEN THE NON UNION RAT IS BETTER THAN THEY ARE. AT LEAST YOU KNOW WHERE THE NON UNION RAT STANDS * * *.
 
 
 8
 (defendant's app. at 8). On October 15, 1991, the fourth day of the strike, LTV and Heckett filed charges with the Board against the Union for engaging in unfair labor practices within the National Labor Relations Act, 29 U.S.C. §§ 158(b)(4)(i) and (ii)(B) (the "Act").[3] The Board filed an amended petition in the district court on December 9, 1991, seeking an injunction. As noted, after a bench trial, the district judge enjoined the Union from disciplining any Heckett employee deemed to have crossed the Levy picket lines until the underlying action against the Union has been resolved. After we heard oral argument, an administrative law judge decided against the Union on the merits; the matter is now before the full Board.
 
 II.
 
 9
 The threshold question in this case is what standard district courts should apply in deciding whether to issue injunctions to halt arguably unfair labor practices. The answer depends on what kind of behavior is being enjoined. In this instance, the Board alleges that Local 150 engaged in an illegal secondary boycott against Heckett and LTV. The National Labor Relations Act makes it illegal to "threaten, coerce, or restrain" one company with the object of putting pressure on a second company not otherwise involved in a strike. 29 U.S.C. §§ 158(b)(4)(i) and (ii)(B). We presume, although the presumption may be rebutted, that if a union pickets a neutral gate, it is attempting a secondary boycott. Mautz & Oren, 882 F.2d at 1122. And a union may not discipline members who cross a picket line to work for a neutral employer. NLRB v. United Ass'n of Journeymen, 827 F.2d 579, 580 (9th Cir.1987).
 
 
 10
 Section 10(l ) of the Act compels a regional director to seek an injunction on the Board's behalf when she has reasonable cause to believe that a secondary boycott has occurred or is occurring. 29 U.S.C. § 160(l);[4] Squillacote v. International Brotherhood of Teamsters, Local 344, 561 F.2d 31, 33 (7th Cir.1977). Section 10(l) in turn instructs the district court to grant the Board's petition if it decides that injunctive relief is "just and proper." The district court understood this admittedly vague language to require a two-stage inquiry: first, an assessment of whether the Board has reasonable cause to seek an injunction; second, an inquiry under the rubric "just and proper" into whether injunctive relief is appropriate. Based on our decision in Kinney v. Pioneer Press, 881 F.2d 485, 489-493 (1989), the district court held that an injunction is "just and proper" if the petitioner can meet the traditional test in equity for granting injunctions ("traditional test"). Thus the district court analyzed (1) whether the petitioner had a reasonable likelihood of success on the merits; (2) whether the petitioner had an adequate remedy at law and/or would be irreparably harmed if the injunction did not issue; (3) whether the threatened injury to petitioner outweighed the threatened harm an injunction would have inflicted on defendant; and (4) whether the granting of a preliminary injunction served the public interest. Faheem-El v. Klincar, 841 F.2d 712, 716 (7th Cir.1988) (en banc).[5]
 
 
 11
 The Board takes issue with the standard adopted by the district court in two regards. First, the Board argues that once reasonable cause is established, no further inquiry is necessary. The Board's position, in essence, is that courts should ignore the "just and proper" language in 10(l). However, the only way to end the inquiry at reasonable cause, as the Board suggests, is to pretend that Congress must not have meant anything when it directed, "Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law" (emphasis added). This Court has noted before that "we must assume Congress understood the meaning of the words it incorporated into the [Act]." Jones v. Hanley Dawson Cadillac Co., 848 F.2d 803, 807 (1988).
 
 
 12
 For the meaning of "just and proper" we need look no further than Pioneer Press, 881 F.2d at 490 n. 3, where we held that with this language Congress commanded courts to apply a traditional equity analysis under section 10(j) of the Act.[6] Accord, Maram v. Universidad Interamericana De Puerto Rico, Inc., 722 F.2d 953, 958-960 (1st Cir.1983) ("just and proper" requires a traditional equitable inquiry because otherwise the Board would automatically be entitled to an injunction every time it could fairly show a chance of success, which it is not). The Board is correct that sections 10(j) and 10(l ) are not identical. Both provisions were enacted in 1947 as part of the Taft-Hartley Amendments to the National Labor Relations Act, Squillacote v. Local 248 Meat & Allied Food Workers, 534 F.2d 735, 741 (7th Cir.1976) ("Meat Workers"). Section 10(l) injunctions are aimed primarily at preventing secondary boycotts, id., and are mandatory in the sense that the Board must seek relief when it has reasonable cause, while section 10(j) vests the Board with discretion to seek injunctions for other labor law violations. Id.
 
 
 13
 It had been the prevailing view among judges on this Court that the standards for issuing injunctions under sections 10(j) and 10(l ) were the same. Id. at 743-744. However, our decision in Pioneer Press overturned Meat Workers and several like cases in one respect: 10(j) does not require the Board to show reasonable cause before seeking an injunction. Pioneer Press reasoned that 10(j), unlike 10(l ), does not contain any language about cause, reasonable or not. Pioneer Press, 881 F.2d at 493. The Board now argues that since the standards for 10(j) and 10(l ) injunctions are different in one respect--reasonable cause is not required in 10(j)--they must be different in every respect. Yet at no point in Pioneer Press did we suggest that the omission of the phrase "reasonable cause" in 10(j) makes it the polar opposite of 10(l ), or that words which mean one thing in 10(j) must mean something else in 10(l ). In general, we may logically assume that when Congress uses the same key phrase in two provisions of one statute, lawmakers intended the words to have the same meaning. The Board is at a loss to explain why the invocation of "just and proper" in one clause should require the determined application of equitable principles while use of the same phrase in another clause requires a district court to engage in no inquiry at all.[7]
 
 
 14
 Second, as a fallback position, the Board contends that even if some inquiry is mandated under the "just and proper" clause, a court should not require the Board to meet the traditional test but a more lenient standard known as the "public interest test," which was articulated in decisions such as FTC v. Elders Grain, Inc., 868 F.2d 901, 903 (7th Cir.1989), and FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1028 (7th Cir.1988). The public interest test has two rather than four prongs and requires a judge merely to determine the likelihood that the governmental agency will prevail on the merits, and to balance the equities. World Travel Brokers, 861 F.2d at 1029. Unlike the traditional test, the public interest test works on a sliding scale so that the greater the plaintiff's success on the merits, the less harm she must show in relation to the harm defendant will suffer if the preliminary injunction is granted. Elders Grain, 868 F.2d at 903. The public interest test is easier to meet than the traditional test because the petitioner need not demonstrate either irreparable injury or that an injunction would serve the public interest.[8]
 
 
 15
 Yet no decision cited by the Board, and no decision of which we are aware, has applied the more lenient public interest test to any governmental agency except the Federal Trade Commission ("Commission"). See, e.g., Elders Grain, 868 F.2d at 903; World Travel Brokers, 861 F.2d at 1028; FTC v. Warner Communications, Inc., 742 F.2d 1156, 1165 (9th Cir.1984); American Motorcyclist Ass'n v. Watt, 714 F.2d 962, 965 (9th Cir.1983); FTC v. Weyerhaeuser Co., 665 F.2d 1072, 1083 (D.C.Cir.1981); FTC v. Simeon Management Corp., 532 F.2d 708, 713-714 (9th Cir.1976). Indeed, opinions considering injunctions requested by the Board frequently discuss irreparable injury, which suggests that these courts are applying the traditional four-prong test. See, e.g., Maram, 722 F.2d at 958-960; Eisenberg for and on Behalf of NLRB v. Hartz Mountain Corp., 519 F.2d 138, 142 (2d Cir.1975). The legislative history of the FTC Act, 15 U.S.C. § 53(b), also makes clear that Congress intended to exempt the Commission from the usual requirements of the traditional standard. World Travel, 861 F.2d at 1028-1029. Indeed, there are cogent reasons for easing the burdens on the Commission that are absent in the Board's case. For example, a court that fails to halt a merger while its anti-competitive implications are contemplated by the Commission may find it quite difficult to later untangle the amalgamation. Elders Grain, 868 F.2d at 904.
 
 
 16
 Besides the fact that no precedent leans in the Board's favor, we think it important that the Board continue to meet the traditional test for two reasons. First, if the public interest test were to spread from the FTC to the NLRB, it would in short order be unleashed upon the rest of the government as well. Second, we are convinced that district judges would read our adoption of the public interest test as a directive to relax the standards for granting injunctive relief to government agencies. And although the traditional test is itself quite flexible--"the district judge has to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal intuitive sense about the nature of the case," Lawson Products, Inc. v. Avnet, Inc., 782 F.2d 1429, 1436 (7th Cir.1986)--injunctive relief still represents an exercise of "very far-reaching power." Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292, 293 (3d Cir.1940). It is an extraordinary tool because it injects the legal system into disputes before a full airing of the facts and a careful consideration of the law, and mistakes can be costly. Lawson, 782 F.2d at 1433.
 
 
 17
 There is simply no good reason to depart from the traditional test in Board petitions for injunctive relief. We hold, therefore, that before issuing a 10(l ) injunction, the district court must first analyze whether the regional director had reasonable cause to seek an injunction; second, the judge must apply the traditional test in equity to determine whether an injunction would be "just and proper."
 
 III.
 
 18
 In this instance, the regional director had reasonable cause to believe the Act had been violated, and has some likelihood of prevailing on the merits. Since these inquiries are similar, we may consider them together.[9] In a reasonable cause inquiry, we ask only whether disputed issues could be resolved by the Board in favor of the regional director's position, Squillacote v. Graphic Arts Int'l Union, AFL-CIO ("Graphic Arts II"), 540 F.2d 853, 860 (7th Cir.1976), and the regional director is given the benefit of the doubt, Danielson v. Joint Board of Coat, Suit & Allied Garment Workers Union, I.L.G.W.U., 494 F.2d 1230, 1245 (2d Cir.1974). The inquiry is narrow, although the court should examine the Board's legal theories as well as its depiction of facts. Teamsters, 561 F.2d at 33. In the somewhat more searching inquiry into the likelihood of success on the merits, the court must find that the petitioner's chances are "better than negligible," no matter how heavily other equities weigh in her favor. Illinois Council on Long Term Care v. Bradley, 957 F.2d 305, 307 (7th Cir.1992).
 
 
 19
 As noted above, labor law is vigilant against boycotts aimed at neutral or "innocent" employers merely as a means to increase costs on a primary employer. See, e.g., Graphic Arts I, 513 F.2d at 1022. The Act represents a decision by Congress that neutral employers cannot be dragged into someone else's labor dispute. FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 428, 110 S.Ct. 768, 778, 107 L.Ed.2d 851 (1990). See NLRB v. Retail Store Employees Union, Local 1001, Retail Clerks Intern. Ass'n, 447 U.S. 607, 616, 100 S.Ct. 2372, 2378, 65 L.Ed.2d 377 (1980). Union protocol does not generally require that workers refuse to enter a work site where the site is only being picketed at another entrance, Mautz & Oren, 882 F.2d at 1122, but the neutral gate must not be used by people whose work is directly related to the primary employer's normal business. United Steelworkers of Am. v. NLRB, 376 U.S. 492, 498-499, 84 S.Ct. 899, 903-904, 11 L.Ed.2d 863 (1964). Therefore, we make a rebuttable presumption that a Union which pickets a neutral site intended an illegal secondary boycott. Mautz & Oren, 882 F.2d at 1122.
 
 
 20
 The parties do not dispute that the Union picketed all entrances to the Indiana Harbor Works plant. Since two of those gates were reserved for neutral traffic, we must presume that the Union intended to draw Heckett and LTV into the strike. The Union has two possible escapes from the law's clear disdain of secondary boycotts. The first is to argue that it was unaware of the reserved gate system; hence the Union's contention that the signs were not visible to the picketers. The district judge, however, found that the Union's claims of ignorance were not credible, and we are not at liberty to challenge this factual determination. It also seems unlikely that the company would go to the expense of this litigation if the whole matter had really been a misunderstanding. If these workers did not actually cross a picket line, why does the Union continue in its efforts to discipline them? Nor is it likely that Union workers could be camped out at three entrances for over a week without realizing one gate was reserved for Levy traffic.
 
 
 21
 The Union's second means of escape is to argue that it should be exempt from the ban on secondary boycotts because the second company--here Heckett--was actually a participant in the strike. It is well-settled labor law that a second firm which helps a primary firm in a strike by picking up the slack in its workload becomes an ally and sacrifices its neutrality. NLRB v. Teamsters Local 810 (Advance Trucking Co.), 299 F.2d 636, 637 (2d Cir.1966); IUOE, Local 459 (Royal Typewriter), 111 N.L.R.B. 317, enf. den., 228 F.2d 553 (2d Cir.1955), certiorari denied, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956). This doctrine may be difficult to apply because, in many cases, a competitor is perfectly happy to see a rival enmeshed in labor strife; an increase in the competitor's business is the natural result of the first firm's inability to satiate customers. On the other hand, a rival firm--particularly if it has an expiring contract with the same union--may wish to see its competitor succeed in dampening labor unrest. And the rival firm may not further this interest by helping the competitor stave off the ill effects of a slackening in production. In this instance, however, we need not grapple with this difficult question because Local 150 has not presented the slightest evidence that Heckett aided Levy in any way during the strike.
 
 
 22
 Since the district judge had reasonable cause to believe Local 150 violated the Act and that petitioner has some chance of succeeding on the merits, we must consider the balance of the traditional equity requirements before concluding that an injunction was "just and proper." Though this inquiry provides a formula for deciding whether an injunction shall issue, it is not to be applied mathematically, and "a formula is not a substitute for, but an aid to, judgment." Lawson Products, 782 F.2d at 1434.
 
 
 23
 The second prong of the test asks whether Heckett and its employees, represented by the petitioner, have an adequate remedy at law and whether they would suffer irreparable injury in the absence of injunctive relief. Martin v. Helstad, 699 F.2d 387, 389 (7th Cir.1983); Roland Machinery, 749 F.2d at 386. Local 150 seeks to discipline fifty-three Heckett employees and, quite possibly, force them out of their jobs. Although the Union claims this harm is theoretical because no one has ever been stripped of a top card before and thus removed from a job, this argument is unconvincing. If the Union retains the power to deprive workers of their livelihoods, we may not blithely assume that the Union will fail to exercise that power even if it has not done so before. Here the workers seek not only damages for loss of their positions, but assurances that they will not be fired at all. See Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir.1970) ("the right to continue a business * * * is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award"). We have held that a remedy of damages is inadequate if, among other things, it comes too late, if the plaintiff cannot finance a lawsuit without revenues that will be lost absent an injunction, or if damages are difficult to calculate. Roland Machinery, 749 F.2d at 386. Loss of job raises each of these concerns. It is obvious that few unemployed workers have enough money to bring their claims to the legal system. Loss of income is usually easy to calculate, but discerning the other terrible personal costs of being unnecessarily unemployed is impossible. In this sense the harm is also irreparable. Although the law frequently attempts to make whole individuals who have been fired, we needn't assume falsely that those who are laid off may simply resume their careers as if they had not been interrupted. Id.
 
 
 24
 The third and fourth equitable inquiries--whether the threatened injury to petitioner outweighs the threatened harm an injunction would inflict on defendant, and whether an injunction would serve the public interest--may be considered together. Martin, 699 F.2d at 392. Local 150 claims that morale will suffer if it cannot punish members seen as scabs. If members are free to ignore picket lines, so the argument goes, there is no reason any individual should suffer the deprivations of a strike and union solidarity will crumble. This argument would be more persuasive if those who entered the facility by the neutral gate worked for Levy rather than Heckett. Recall that the Heckett workers were not on strike; they were obligated to continue working under a contract signed by this very Union. Local 150's argument would also have more gusto if the Union really could not discipline recalcitrant members. In this case, however, if the Board decides that the Union was not trying to pressure Levy through illegal means, the Union will be perfectly free to hold a mass trial to punish the fifty-three Heckett workers. In the meantime, the ephemeral threat to Union morale seems much less onerous than the alternative--subjecting these workers to unemployment.
 
 
 25
 Congress, acting on behalf of the public, has unambiguously denounced secondary boycotts. Protecting workers torn between loyalty to their Union and a legal commitment to continue showing up for work seems an apt use of the extraordinary power of the equitable remedy. For the foregoing reasons, the injunction imposed by the district court is affirmed.
 
 
 
 *
 The Honorable Terence T. Evans, Chief Judge of the Eastern District of Wisconsin, is sitting by designation
 
 
 [1]
 Unless otherwise noted, references to the Board also include the petitioner, Elizabeth Kinney, the regional director who represents the Board's interests in this matter
 
 
 [2]
 The district court's findings of fact are presented in the somewhat odd format of restating what witnesses said at trial. Thus it is not clear if the court adopted these statements as true. For a variety of reasons, we believe that the district court did adopt this testimony as an accurate reflection of what happened. First, all of these statements are in a section of the opinion labeled "FINDINGS OF FACT" and which begins with the statement, "The Court hereby finds that: * * *." Second, the court quoted testimony selectively. Judge Lozano, for example, cited testimony from an LTV official that he told Union employees about the reserved gate system (defendant's app. at 6), but the court did not mention the Union's denial of such knowledge. Third, the judge's issuance of an injunction would make no sense at all if he had not made a factual finding that the Union's members were cognizant that a reserved gate system was in place
 
 
 [3]
 Relevant portions of 29 U.S.C. § 158(b) provide that it shall be an unfair labor practice for a labor organization or its agents:
 [b](4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
 (ii)(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees * * *: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing * * *.
 
 
 [4]
 Section 10(l ) provides:
 Whenever it is charged that any person has engaged in an unfair labor practice * * *, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, * * * for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law. * * *
 
 
 [5]
 The Regional Director criticizes the district judge for relying on a five-prong rather than the traditional four-prong test. Judge Lozano, however, merely separated irreparable injury from the requirement that the Board have no adequate remedy at law. Although described in the cases as a four-prong test, it actually does involve five (if not more) factors unless irreparable injury and no adequate remedy mean the same thing. Roland Machinery Co. v. Dresser Industries, 749 F.2d 380, 383 (7th Cir.1984). We have held that where the only damages sought are monetary, these two prongs merge and the test actually involves only four prongs. Id. at 386. Where permanent equitable relief is sought, the irreparable injury requirement is intended to thwart temporary injunctions in cases where a legal remedy is insufficient but relief can wait until the end of the trial. Id. In this instance, where injunctive relief is the ultimate goal, the petitioner must show both irreparable injury and no adequate remedy at law. For consistency's sake, though, we will continue to refer to the traditional test in equity as a four-prong test
 
 
 [6]
 Section 10(j) provides:
 The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.
 
 
 [7]
 Petitioner implies that to read "just and proper" as requiring a traditional equitable analysis is a departure from earlier decisions. Not so. We have never expressly considered the meaning of "just and proper" in section 10(l ) and, indeed, have frequently engaged in the kind of searching equitable analysis discussed by Pioneer Press in the context of 10(j) and 10(l ) injunctions, even if those analyses were not labeled as "just and proper" inquiries. See, e.g., Squillacote v. Graphic Arts Int'l Union (GAIU), Local 277, 513 F.2d 1017, 1022 (7th Cir.1975) ("Graphic Arts I") (discussing the irreparable harm to a company in terms of the urgency of issuing an injunction)
 
 
 [8]
 Pioneer Press gives conflicting signals about which test to apply. At one point the opinion says "[s]ection 10(j) tells the district court to do what's 'just and proper', which we read as a statement that traditional rules govern--the approach emphasizing the public interest when the government is the plaintiff." 881 F.2d at 491. Elsewhere the opinion states that a party, before securing an injunction, must demonstrate "(i) no adequate remedy at law, (ii) irreparable harm * * *, (iii) a reasonable likelihood of winning on the merits, and (iv) harm to the public interest * * *." Id. at 490 n. 3. This, of course, is the traditional test
 
 
 [9]
 One could argue that the reasonable cause requirement and the analysis under "just and proper" are redundant because, obviously, one doesn't have much chance of winning on the merits if no reasonable cause for seeking an injunction existed to begin with. However, the statute directs the regional director to satisfy the reasonable cause standard, while courts are directed to satisfy the "just and proper" standard. Judges have taken up a reasonable cause analysis under 10(l ) not to satisfy the mandate of Congress but as a convenient threshold requirement--it stands to reason that if the Board through its regional director cannot establish reasonable cause, it is unnecessary to embark on the more involved inquiry required to find that an injunction is "just and proper." In a case such as this where the petitioner has some likelihood of prevailing on the merits, a court may consider this together with reasonable cause