Elizabeth KINNEY, Regional Director of Region 13 of the National Labor Relations Board, For And On Behalf of the National Labor Relations Board, Petitioner,

v.

CHICAGO AND NORTHEAST ILLINOIS DISTRICT COUNCIL UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA, AFL–CIO, and United Brotherhood of Carpenters and Joiners of America, Local No. 13, AFL–CIO, Respondents.

No. 93 C 3294.

United States District Court, N.D. Illinois, E.D.

June 17, 1993.

Jessica Willis Muth, N.L.R.B., Chicago, IL, for petitioner.

Collins P. Whitfield, Hugh J. McCarthy & Associates, Chicago, IL, for respondents.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

HART, District Judge.

### I. INTRODUCTION

The Regional Director of Region 13 of the National Labor Relations Board ("the board") has petitioned for injunctive relief pursuant to Section 10($l$) of the National Labor Relations Act ("NLRA"), 29 U.S.C. Sec 160($l$).[1] Respondents are the Chicago and Northeast Illinois District Council United Brotherhood of Carpenters & Joiners of America, AFL–CIO [2] and the United Brotherhood of Carpenters and Joiners of America, Local No. 13, AFL–CIO (collectively "the union"). In her petition, the regional director requests that the union be enjoined from picketing McHugh Bowles Development, Ltd. ("the charging party" and "McHugh Bowles"). A hearing was held on

June 10, 1993 and oral argument was presented June 11, 1993. The parties have submitted proposed findings of fact and conclusions of law.

### II. FINDINGS OF FACT

1. McHugh Bowles, the charging party, is the general contractor constructing town homes located at 911–933 Racine Avenue (the "Riverwest Project") in the City of Chicago. Work at this construction site began during March 1992. During the past calendar year, a representative period, the charging party received gross revenues in excess of $500,000 from the management of apartment buildings and has purchased and received goods and materials valued in excess of $50,000 from suppliers located in Illinois who purchased and directly received those materials from sources located outside Illinois.

2. Some time prior to April 28, 1993, Michael Sexton, a business agent of Local 13, visited the site of the Riverwest Project and talked with Bob Pozdol, an employee of McHugh Bowles. After learning that Pozdol worked for McHugh Bowles, Sexton left his business card at the McHugh Bowles office. On or about April 28, 1993, Paul McHugh, a principal owner and vice president of McHugh Bowles, arranged to meet with Thomas Hohman, manager of the organizing department of the District Council, and Michael Sexton. At that meeting, the Riverwest Project was discussed. Hohman asked who was going to be doing the carpentry work. Hohman told McHugh that the union was interested in representing any carpenters on the job site. McHugh indicated that McHugh Bowles did not have any carpenters on the job and that Charles Schenk, who had been seen on the job, "just worked for McHugh." McHugh indicated that he did

---

1. Section 10($l$) provides as follows: "Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title [secondary boycott] ... the preliminary investigation of such charge shall be made forthwith.... If, after such investigation, ... reasonable cause [exists] to believe such charge is true and that a complaint should issue, [the Board] shall ... petition any United States district court ... for appropriate injunctive relief pending the final adjudication of the Board.... [T]he district court shall have jurisdiction to grant such injunctive relief ... as it deems just and proper, notwithstanding any other provision of law." 29 U.S.C. § 160($l$).

2. The District Council is an association of labor organizations, including Local 13, and is a labor organization within the meaning of Section 2(5) of the NLRA.

not know who would be doing the carpentry work and asked for a list of union carpenters. At no time during the meeting did either union representative threaten any type of economic pressure or provide any names of union carpenters.

3. On May 4, 1993, McHugh, along with his business partner Jeff Bowles, president of McHugh Bowles, again met with Hohman and Sexton. At this meeting, the union representatives were informed that D.T. Builders, Inc. ("D.T."), a Crown Point, Indiana company, had the carpentry subcontract for the Riverwest Project and that D.T. was not a union firm. Hohman indicated that the union wanted a contract with D.T. or any other carpenters. He did not request that McHugh Bowles terminate its relationship with D.T. Bowles related stories of prior dealings with the carpenters' unions involving threats of violence and property damage. Hohman insisted that the union was interested in business only and asked that McHugh Bowles sign an 8(f) agreement.[3] McHugh Bowles declined. The union did not threaten to picket. McHugh asked for alternatives between getting rid of D.T. and keeping D.T. subject to a strike. The union indicated that if D.T. was the carpenter for the site, that D.T. should enter an 8(f) agreement with the union. Thereafter, D.T. indicated it would not sign an 8(f) agreement with the union.

4. On May 5, 1993, McHugh Bowles wrote to the union advising that a reserved gate would be established at the Riverwest Project for D.T. The letter states as follows:

Re: Riverwest Citihomes Phases I, II, and III located at 911–933 North Racine and 856–900 N. Elston, Chicago, Illinois

Dear Mr. Sexton:

I am the president of McHugh Bowles Development, Ltd. which is the construction manager (and the General Partner of Riverwest Citihomes Limited Partnership which is the developer) for the above-identified construction site. In response to the possibility of Local 13 pickets ostensibly directed to D.T. Builders, the carpentry contractor (for labor only) on the site, be advised that a "reserved gate" system has been established at the site.

Effective May 6, 1993, the ingress and egress of employees, agents and suppliers of D.T. Builders is restricted to the gate located on the east side of the site (facing Elston Avenue).

The ingress and egress of all other subcontractors, their employees, agents and suppliers is restricted to the gate located on the west side of the site (facing Racine Avenue).

In accordance with the principles announced in Sailors Union of the Pacific (Moore Dry Dock Co.), 92 NLRB 547 (1950) and its progeny, we insist that the Local 13 honor the above-referenced reserved gate and confine its picketing to the gate reserved for D.T. Builders. Further, the Local 13 picketing is permitted only when D.T. Builders is present on the site. We will be providing you with schedules of when D.T. Builders will be present at the site.

Very Truly Yours,

/s/

Jeff Bowles

President

McHugh Bowles Development

5. On May 10, 1993, the union began picketing D.T. at a reserved gate established for the exclusive use of D.T. and its suppliers by McHugh Bowles on Elston Avenue. Three picketers with signs and vests indicating a strike against D.T. for a contract were assigned to the reserved gate on Elston Avenue. Sexton and Tom Ryan, Jr., another Local 13 business representative, were also present. One "observer" was assigned to the neutral gate on Racine Avenue to make sure

---

**3.** Ordinarily, the NLRA prohibits employers and unions from entering into collective bargaining agreements unless the union is backed by a majority of the relevant bargaining unit's employees. *See* NLRA §§ 8(a), (b), 29 U.S.C. §§ 158(a), (b). An exception to this requirement is set forth in NLRA § 8(f), 29 U.S.C. § 158(f), which allows employers and unions to enter into "pre-hire" agreements before the union achieves majority status. This exception is limited to the building and construction industry and allows union representation where employment may be of a short duration and employers obtain employees on a project-by-project basis. *See Forest City/Dillon–Tecon Pacific*, 209 NLRB 867, 868–70, 1974 WL 4881 (1974).

neither D.T. nor any of its suppliers avoided the reserved gate. The observer wore a strike vest inside-out which read "OBSERVER" on the front and back. The reserved gate led to the back of the Riverwest Project site. All others were to enter through the neutral gate on Racine Avenue.

6. On May 10, 1993, a Hines lumber supply truck arrived at the neutral Racine gate around 7:15 a.m. According to McHugh, the driver spoke with the observer and drove away. Lena Truss also arrived at the neutral gate with a Stevenson crane, spoke with the observer and drove away. A driver with a load of trusses also arrived at the neutral gate, spoke with the Lena driver and did not deliver its load of trusses because the crane had not been delivered. The electrical contractor, scheduled to arrive on May 10, failed to appear. David Davis of D.T. Builders was given a letter from the union's counsel, Hugh J. McCarthy & Assoc., requesting a meeting to negotiate a contract.

7. On May 11, 1993, McHugh arrived at the Riverwest Project to find that a red truck belonging to one of the union picketers was parked in front of the reserved gate on Elston. Vehicles entering the reserved gate had to go over the curb and sidewalk running along Elston Avenue. McHugh Bowles had obtained permits to allow vehicles to go over the curb and sidewalk. The street in front of the reserved gate allowed parking except between the hours of seven and 9:00 a.m. and except within fifteen feet of a fire hydrant located at the extreme end of the 20 to 40 foot gate. McHugh's requests to move the truck were ignored. McHugh contacted the police, who told the picketer to move the truck, which he did. The gate was opened and the D.T. carpenters entered the job site. However, the carpenters left at 9:00 a.m. because the lumber truck had not delivered any lumber. The picketers remained at the reserved gate until 10:00 a.m. Neither the plumbers nor the electrical contractor came to the project as scheduled.

8. On May 12, 1993, there were three picketers at the reserved gate on Elston and one observer and another union member at the neutral gate on Racine. At approximately 8:00 a.m., McHugh asked that the union not picket the neutral gate because materials were not getting through. At 9:00 a.m. on May 12, McHugh delivered another letter[4] from Bowles to Sexton notifying the union that no employees of D.T. would be present at the job site on May 13, 1993 but would return on May 14, 1993.

9. On May 13, 1993 at 6:45 a.m. there were no picketers at the Elston reserved gate but there were three members without signs or vests at the neutral gate. Some time after 7:00 a.m., lumber, trusses and a crane were delivered to the site. Behind McHugh's back, he heard one of the three union members insist they "find out who that crane operator is." At 10:00 a.m., the crane, being rented by the hour, was ready to be taken away but could not leave because Ryan's car was blocking the neutral gate. The police were called, asked Ryan to move the car, and left. Ryan moved his car and its spot was immediately taken by another union member's car. At noon, the crane was able to leave.

10. Since May 10, 1993, McHugh Bowles has received no work from the electrical subcontractor who said he would not work if the union was striking D.T. McHugh Bowles terminated the electrician and is currently in litigation with him. Since May 10, the concrete subcontractor has worked only one-half day. Even though the concrete subcontractor, SCI Construction, was informed that a reserved gate had been established, it was unwilling to enter the site. Also, the paint subcontractor, has not worked. The sewer, insulation, tile and masonry subcontractors have performed no work since May 10, 1993.

11. Four of the town houses are sold and due to close in June. At this point it is very unlikely that McHugh Bowles can get the

---

4. This letter in pertinent part, states as follows:

I am hereby informing you that no employee agent or supplier of D.T. Builders will be on the above-referenced construction site on the day of May 13, 1993.

We therefore insist that you do not picket either the site, any gate to the site or come with the statutorily mandated distance of the site on May 13, 1993.

D.T. Builders will return to the site on or after 5:00 AM on May 14, 1993.

town Houses prepared before the closing dates because contractors have not been working. According to McHugh, buyers may cancel their purchase contracts if the town houses are not delivered on time. Additionally, real estate brokers have refused to show the site to prospective buyers if the strikers are present. McHugh testified that McHugh Bowles stood to lose $600,000 if the town homes are not delivered. These losses are due to the fact that certain union contractors and their employees will not enter a construction site where lawful picketing is occurring.

12. On May 15, 1993, D.T. was not scheduled to be at the site. However, two union members were at the neutral gate taking pictures of McHugh and the heating subcontractor. Sexton allegedly asked McHugh if he "had lost enough money yet." The union was not notified that D.T. would be absent on May 15, 1993, and no such statement was made by Sexton.

13. On May 21, 1993, Bowles notified Sexton that D.T. would not be on the site from May 24 through May 26. Pet'r's Ex. 3.

14. On May 24, 1993, picketers with signs demanding a contract with McHugh Bowles began striking both gates. None of the picketers were carrying signs against D.T. Sexton told McHugh that the union had changed its strategy and was now picketing McHugh Bowles for recognition. Sexton handed McHugh a handwritten letter requesting that McHugh Bowles enter into an 8(f) agreement with the union. The union has continued to picket McHugh Bowles.

15. McHugh Bowles has five people it considers employees, including Bowles, McHugh, Pozdol, a property manager not involved with the Riverwest Project, and a summer intern. McHugh Bowles pays Charles Schenk to supervise the work at Riverwest, including subcontractors and Pozdol. McHugh Bowles pays Schenk $20 per hour under a written contract based on bills submitted by Schenk. McHugh Bowles does not pay social security or unemployment taxes on Schenk's pay. McHugh testified that he is often at the Riverwest site and that Schenk is under McHugh's supervision.

16. Both Pozdol and Schenk work alongside the D.T. carpenters and may do similar work loading, cutting and putting up lumber.

17. There has been no violence associated with the union's strike activity. Although the project has experienced some property damage, including broken windows and some timber theft, there is no evidence to show that the damage is other than common vandalism unassociated with the labor dispute.

18. The parties agreed at oral argument and the court finds, that the union is not guilty of improper conduct at the neutral gate. The court also finds that, with the exception of short instances in which it blocked the reserved gate, the union did not engage in improper conduct at the reserved gate. Conversations between union representatives and suppliers or contractors entering the site were not shown to be improper.

### III. CONCLUSIONS OF LAW

Under the NLRA, 29 U.S.C. §§ 158(b)(4)(ii) and (ii)(B), it is illegal to "threaten, coerce, or restrain" one company "with the object of putting pressure on a second company not otherwise involved in a strike," *Kinney v. International Union of Operating Engineers, Local 150, AFL-CIO*, 994 F.2d 1271, 1275 (7th Cir.1993). Such activity is referred to as a secondary boycott. *Id.* Under section 10(*l*) of the NLRA, whenever certain charges of unfair labor practice are made, including charges of secondary boycott, the regional director of the National Labor Relations Board is required to investigate those charges. 29 U.S.C. § 160(*l*). If, after an investigation, there is "reasonable cause to believe such charge is true," and that a complaint should be filed with the board, the regional director is required to seek an injunction in district court. *Id.*

After an investigation, petitioner concluded that there was reasonable cause to believe the union has engaged in, and continues to engage in, a secondary boycott against McHugh Bowles. Petitioner seeks to enjoin the union from picketing McHugh Bowles. The director argues that because the union began picketing McHugh Bowles on May 24, immediately after picketing D.T., that the picketing is a sham designed to force

McHugh Bowles to stop using D.T.'s non-union carpenters. The director also argues that the union threatened McHugh Bowles with picketing against D.T. if D.T. was used on the Riverwest Project.

■ In ruling on petitions for preliminary injunction under section 10(*l*), the court applies a two-stage inquiry. *See Operating Engineers, Local 150*, at 1275. First the court assesses whether the board has the "reasonable cause" for a complaint and to seek an injunction. *Id.* If the board has reasonable cause, the court is to enter an injunction if it is "just and proper" to do so. Section 10(*l*) of the NLRA, 29 U.S.C. § 160(*l*). The Seventh Circuit has held that the correct standard in determining whether an injunction is "just and proper" is to apply the traditional equitable analysis applicable to injunctions generally. *Operating Engineers, Local 150*, at 1277. Although traditional injunction analysis is quite flexible, it requires a more thorough analysis than equating "just and proper" with the reasonable cause standard. "[I]njunctive relief still represents an exercise of 'very far-reaching power.' ... It is an extraordinary tool because it injects the legal system into disputes before a full airing of the facts and a careful consideration of the law, and mistakes can be costly." *Id.*

■ In determining whether the board has reasonable cause necessitating a motion for injunction, the court applies a very lenient standard.[5] The board has reasonable cause if "disputed issues could be resolved by the Board in favor of the regional director's position and the regional director is given the benefit of the doubt." *Id.* at 1278 (citing *Squillacote v. Graphic Arts Int'l Union, AFL–CIO (Graphic Arts II)*, 540 F.2d 853, 860 (7th Cir.1976); *Danielson v. Joint Board of Coat, Suit & Allied Garment Workers Union, I.L.G.W.U.*, 494 F.2d 1230, 1245 (2d Cir.1974)). This benefit of the doubt applies to both issues of fact and theories of law. *Id.* (citing *Squillacote v. International Brotherhood of Teamsters*, 561 F.2d 31, 33–34 (7th

Cir.1977) (the regional director's legal theory must be substantial and not frivolous)).

■ One of the regional director's legal theories is substantial. She argues that the union's picketing of McHugh Bowles, beginning on May 24, 1993, immediately after the union suspended picketing against D.T., amounts to a secondary boycott designed to pressure McHugh Bowles to replace D.T. with a union subcontractor. Since D.T.'s carpentry employees are not considered employees of McHugh Bowles, *see NLRB v. Denver Building & Construction Trades Council*, 341 U.S. 675, 689, 71 S.Ct. 943, 951–52, 95 L.Ed. 1284 (1951), and, the director argues, McHugh Bowles has no carpentry employees of its own, the union's strike against McHugh Bowles as the new primary is unlawful. *See NVE Constructors, Inc. v. NLRB*, 934 F.2d 1084, 1090 (9th Cir.1991) (union may not picket for an 8(f) agreement when employer does not currently employ any employees in the unit sought). The disputed issues of fact relevant to this legal theory are whether or not McHugh Bowles' employees, Pozdol or his replacement, perform carpentry work and whether Schenk should be considered an employee of McHugh Bowles and, if so, whether he too performs carpentry work. These issues could be resolved by the board in favor of the regional director's position and the board has reasonable cause to file a complaint and seek an injunction.

■ In order to obtain a preliminary injunction, petitioner must, as a threshold, show: (1) that there is no adequate remedy at law, (2) that the charging party will suffer irreparable harm if the injunction is not granted, and (3) some likelihood of succeeding on the merits in the sense that the regional director's chances are better than negligible. *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1010–11 (7th Cir.1990); *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir.1986); *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386–88 (7th Cir.1984). If the petitioner meets this threshold, the court

---

**5.** As a practical matter, the Seventh Circuit noted, the reasonable cause standard and requirement of some likelihood of success on the merits are somewhat redundant. *Operating Engineers, Local 150*, at 1278 n. 9. Reasonable cause has not been folded into this opinion's traditional injunction analysis for the sake of clarity and fidelity to the language of the statute.

then applies a "sliding scale" analysis, balancing the harm to the parties and the public from the grant or denial of relief and the likelihood of success on the merits. *Village of Wilmette,* 914 F.2d at 1011; *Roland Machinery,* 749 F.2d at 387. The sliding scale analysis is designed to minimize the costs of mistake in ruling on a preliminary injunction. *American Hosp. Supply Corp. v. Hospital Prods., Ltd.,* 780 F.2d 589, 593 (7th Cir.1986). Therefore, the greater the showing of likelihood of success, the lesser need be the balance of irreparable harm, and vice versa. *Roland Machinery,* 749 F.2d at 387.

In the *Operating Engineers, Local 150* case, the Seventh Circuit rejected the board's argument that a more lenient standard such as the "public interest test" articulated in *FTC v. Elders Grain, Inc.,* 868 F.2d 901, 903 (7th Cir.1989) and *FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1028 (7th Cir.1988) should apply to "just and proper" rather than a "traditional" injunction test. *Id.* at 1277. In distinguishing the public interest test from the traditional test the court noted that the public interest test has "two rather than four prongs" and "[u]nlike the traditional test, the public interest test works on a sliding scale so that the greater the plaintiff's [likely] success on the merits, the less[er] harm she must show in relation to the harm defendant will suffer if the preliminary injunction is granted." *Id.* The court then went on to state that "[t]he public interest test is easier to meet than the traditional test because the petitioner need not demonstrate either irreparable injury or *that an injunction would serve the public interest.*" *Id.* at 1277 (emphasis added).

Although the *Operating Engineers, Local 150* court distinguished the traditional from the public interest test by noting the absence of a sliding scale, a sliding scale was applied in *National People's Action,* 914 F.2d at 1010–11, where a traditional four-prong test was applied. The use of the term "sliding scale" is used simply to illustrate the type of balancing involved once the threshold elements of irreparable harm, inadequate legal remedy and some likelihood of success are established and the public interest considered. Therefore the distinction between the

tests appears to have more to do with the necessary elements than it does with the use of terms like sliding scale or balancing. *See Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 11–12 (7th Cir.1992). The more important distinction the Seventh Circuit drew between the two standards is the lack of basic elements in the public interest standard, which the Seventh Circuit limited to FTC cases. *Operating Engineers, Local 150,* at 1276–77.

■ The regional director argues that the employer, McHugh Bowles, has no adequate remedy at law because an action against the union to recoup financial losses resulting from illegal activity will not remedy the immediate illegality of the actions. She also argues that unless the union is enjoined, McHugh Bowles will be forced to acquiesce to the union's economic pressure, cease doing business with D.T. and hire a union carpenter. The alternative, according to petitioner, is to keep D.T. but not complete the four town homes scheduled to close in June. Petitioner's brief argues that each town home is worth $150,000 and McHugh testified that McHugh Bowles stood to lose $600,000 if the town home sales could not be closed on time.

As indicated in the findings of fact, the delays which were causing loss to McHugh Bowles during the strike against D.T. were due to the fact that certain contractors and their employees will not enter a site where picketing is conducted even if a neutral gate has been established. This effect, even if foreseeable, does not make the union responsible for the losses. The union:

has every right to picket the primary employer at the work site, even though this picketing might incidentally, but foreseeably, have a *substantial* effect on secondary employers. Section 8(b)(4) proscribes only union activity whose "object" or purpose is to coerce secondary employers. And there is an important distinction between *intending* to enmesh secondary employers in a dispute not their own, and acting with knowledge that secondary employers will inevitably be affected by the union's actions. Even if the union's picketing has substantial (*and foreseeable*) secondary *effects,* that conduct does not vio-

late section 8(b)(4) unless the employer satisfies its burden of establishing that the union *intended* to cause disruption of the secondary employer's business.

*Mautz & Oren v. Teamsters Local No. 279,* 882 F.2d 1117 (7th Cir.1989). The evidence at the hearing showed that, even with a neutral gate system, many suppliers and subcontractors were unwilling to enter the site. However, this incidental effect of the strike against D.T., having more to do with the cohesion of the unions, does not, without more, indicate that it was the union's intent to hurt McHugh Bowles by picketing D.T.

However, if it is assumed for purposes of argument, that illegal conduct has been shown, it has not been shown that the harm cannot be remedied by money damages. "[A] remedy of damages is inadequate if, among other things, it comes too late, if the plaintiff cannot finance a lawsuit without revenues that will be lost absent an injunction, or if damages are difficult to calculate." *Operating Engineers, Local 150,* at 1279 (citing *Roland Machinery,* 749 F.2d at 386). McHugh testified that if the four town homes due to close in June were not completed and delivered on time, that McHugh Bowles stood to lose $600,000. Although McHugh's calculation appears oversimplified, there was no testimony that damages resulting from unlawful union action would be difficult to calculate. Furthermore, an ability to quantify damages from unlawful union action indicates that an action for damages would be an adequate remedy at law. Although McHugh Bowles has very few employees, there was no testimony that McHugh Bowles would not be able to finance a suit against the union. Petitioner argues that failure to issue the injunction will force McHugh Bowles to ac-

quiesce in the union's unlawful demands and replace D.T. However, the contract proposed by the union would only require McHugh Bowles to recognize the contract for Schenk and other employees doing carpentry and, under section 3.5 of the contract,[6] track D.T. carpenters' time and remit contributions for them. Even if the union's efforts toward this end are determined to be unlawful, there has been no showing that such a result would work irreparable harm upon McHugh Bowles or that it could not be remedied in an action at law. Therefore, petitioner has failed to show that McHugh Bowles would suffer irreparable injury absent an injunction and that no adequate remedy at law exists. Petitioner has not met the threshold showing necessary to obtain a preliminary injunction. However, even if petitioner had introduced evidence that McHugh Bowles would suffer irreparable injury and that no adequate remedy at law exists, no preliminary injunction would issue for the reasons discussed below.

In order to obtain an injunction, petitioner must also, as a threshold matter, show that she has some likelihood of success on the merits. Petitioner has advanced several theories of secondary boycott. Petitioner argues that the union verbally threatened McHugh Bowles against using non-union carpentry subcontractors. However, the hearing testimony regarding alleged verbal threats by the union was not credible.[7]

▮ Petitioner also argues that the union's picketing activity against D.T. between May 10 and May 23, 1993, constituted an illegal secondary boycott designed to get McHugh Bowles to drop D.T. The evidence produced at the hearing showed that the union honored the *Moore Dry Dock* standards governing secondary motivation in common situs/re-

6. Section 3.5 of the "Area Agreement" McHugh Bowles was asked to sign provides that if the employer [McHugh Bowles] contracts *or subcontracts* any work covered by the agreement to any person not a signatory to the area agreement, that the employer shall either require the subcontractor to be bound by the agreement or *the employer shall maintain daily records of the subcontractor's or subcontractor's employees' job site hours and be liable for payments to the union.* Such contract provisions are legal between unions and employers in the building and construction industry. *See Chicago District Council of Carpenters Pension Fund v. Yonan,* 553 F.Supp.

653, 659 (N.D.Ill.1982), *vacated in part,* No. 81 C 2429, 1986 WL 7972 (N.D.Ill. July 9, 1986); *see also Polk Bros.,* 275 NLRB 294, 1985 WL 45664 (1984); NLRA § 8(e).

7. Petitioner's argument that the court is not to make credibility determinations at the preliminary injunction stage is not supported by the Seventh Circuit's opinion in *Operating Engineers, Local 150,* at 1278 (court of appeals would accept district judge's factual determinations as to credibility).

served gate cases. *See Sailors' Union of the Pacific (Moore Dry Dock),* 92 NLRB 547, 549 (1950). Namely, a union's picketing is presumed to be lawful primary activity (against D.T.) if: (a) picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's (McHugh Bowles') premises; (b) the picketing takes place when the primary employer is engaged in its normal business at the situs; (c) picketing is limited to places reasonably close to the location of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer. *Id.; see also Mautz & Oren v. Teamsters Local No. 279,* 882 F.2d at 1121. The evidence shows that the union has, in material respects, adhered to these principles in its picketing activities against both D.T. and McHugh Bowles. Although McHugh alleged that picketers against D.T. were stationed at both the Elston reserved gate and the Racine neutral gate, on cross examination, McHugh conceded that those members stationed at the neutral gate were either observers or were not wearing strike vests.

Petitioner's allegation in her brief that the observers wore vests that said "observer" on one side and "on strike" on the other is completely misleading. At the hearing, the observer vest was introduced. The observer vest was indeed a strike vest which when turned inside-out and worn read "observer" on the front and back. Worn in this fashion, no strike language was visible and it was clear that the individual was merely an "observer." Petitioner also argues that the observer talked with the drivers of the lumber, crane and truss trucks as they entered the neutral gate. However, there was no evidence introduced as to whether the drivers stopped to talk or were hailed by the observer. Petitioner has cited no facts or authority suggesting that the actions of the observers were improper. Additionally, as the union notes, the use of the neutral gate by the Hines lumber truck was arguably improper since, as the supplier for D.T., it should have also used the reserved gate for D.T. and its suppliers. *See J.F. Hoff Electric Co. v. NLRB,* 642 F.2d 1266, 1275 (D.C.Cir.1980) (supplies used only by primary should have gone through reserved gate).

Petitioner's allegation that the union on two occasions parked a truck so as to block the reserved gate and blocked the neutral gate once is supported by credible evidence, but other than delaying the departure of the crane for two hours, no substantial violations of the *Moore Dry Dock* standards are alleged. *See International Union of Operating Engineers (Linbeck Construction Co.),* 219 NLRB 997, 998–999, 1975 WL 5866 (1975), *enf'd,* 550 F.2d 311 (5th Cir.1977) ("partial and sporadic breach[es]" do not establish unlawful secondary objective where union "substantial[ly] compli[ed]" with *Dry Dock* criteria). Although petitioner's brief argues that the union picketed on May 14 and May 15 when D.T. was not present on the site, the testimony at the hearing indicated that the union was notified D.T. would not be on the site on May 13 and that the union had no *picketers* at the site that day. The testimony and letters introduced also indicate that D.T. was to return on May 14 and the union picketed on that day. Furthermore, although the union picketed on May 15, the union was not informed, as they should have been, that D.T. would not be there. Although petitioner's argument that the union's picketing of D.T. constituted unlawful secondary activity against McHugh Bowles has more than a negligible chance of success, it does not have much more than this.

Of petitioner's arguments, the most likely to succeed is the argument that the union's picketing directly against McHugh Bowles beginning on May 24 is a secondary boycott designed to get McHugh Bowles to replace D.T. with a union subcontractor. There is more than a negligible chance that the regional director will succeed in showing that McHugh Bowles does not currently directly employ persons doing carpentry work. Although the union alleges that it saw Pozdol, a general laborer, handling lumber and possibly using a "Skil saw," Pozdol left McHugh Bowles on May 10, when the strike against D.T. began, and was replaced with another laborer. No evidence was introduced showing that Pozdol's laborer replacement has done carpentry work. Schenk, whom McHugh Bowles argues is an independent contractor, could also possibly be doing car-

pentry work. Hohman testified that he had seen Schenk, who was in charge of overseeing all work at the Riverwest Project, working "alongside D.T. loading lumber two-by-four's and helping to brace a wall." The union argues that it considers those who help carpenters potential members. Nonetheless, petitioner has shown some likelihood of succeeding on this argument.

The union's ability to seek recognition or an agreement from either D.T. or McHugh Bowles is strictly circumscribed. The union may picket for only 30 days without filing a petition for an election under § 159(c). 29 U.S.C. §§ 158(b)(7)(C), (f); *NVE Constructors*, 934 F.2d at 1090. The union has every right to first picket D.T. and then to picket McHugh Bowles for a contract covering its employees and seeking contributions for D.T.'s employees. Petitioner attempts to show that the brief hiatus between the picketing shows that the intent of the union was to harm McHugh Bowles. *Citing Newspaper & Mail Deliverers (Macromedia Publishing)*, 289 NLRB 537, 540 (1988); *McClintock Market, Inc.*, 244 NLRB 555, 556 (1979). Both cases are factually distinct, involving more direct violations of the *Moore Dry Dock* standards, and involve informational strikes as opposed to recognitional pickets. Although the petitioner ascribes an improper motive to the actions of the union; petitioner has not established a presumption that the union is acting unlawfully. Where the union is so circumscribed in its picketing action, the court will not prevent the union from its activities without a showing of much clearer evidence of unlawful activity. The union has a legitimate interest in seeking a contract to cover both Schenk and any other employees of McHugh Bowles that perform carpentry work as well as to get McHugh Bowles to agree to remit contributions for D.T.'s employees' hours. Petitioner has cited no authority suggesting that seeking such a contract is unlawful. The provisions of the NLRA, § 8(b)(4)(i) and (ii)(B), reflect the dual objectives of Congress, of preserving the right of labor organizations to bring pressure to bear on offending employees in primary labor disputes and of shielding unoffending employers and others from controversies not their own. *Denver Building &*

*Construction Trades Council*, 341 U.S. at 692, 71 S.Ct. at 953.

Additionally, the public interest would not be served by cutting off the already circumscribed right of the union to seek representation of workers absent a clear showing of unlawful activity. That the union's picketing may be indirectly costly to McHugh Bowles is not a sufficient reason alone to prevent the union from proceeding with its limited rights to picket for recognition. In sum, the balance does not tip in favor of injunctive relief when the nature of the harms is analyzed and the public interest is also considered.

IT IS THEREFORE ORDERED that petitioner's request for a preliminary injunction [1] is denied. The Clerk of the Court is directed to enter a judgment denying the petition for injunctive relief.