**FEDERAL TRADE COMMISSION,**
**Plaintiff–Appellee,**

v.

**ELDERS GRAIN, INC. and Illinois Cereal Mills, Inc., Defendants–Appellants.**

**Nos. 88–2493, 88–2494.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1988.

Decided Jan. 30, 1989.

---

James H. Sneed, Eugene J. Meigher, Arent, Fox, Kintner, Poltkin & Kahn, Washington, D.C., for defendants-appellants.

David C. Shonka, Federal Trade Com'n, Washington, D.C., for plaintiff-appellee.

Before POSNER and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

The parties to an acquisition appeal from a preliminary injunction, issued upon the application of the Federal Trade Commission, that ordered them to rescind the acquisition pending administrative proceedings to determine whether it violates section 7 of the Clayton Act, as amended, 15 U.S.C. § 18. Section 7 forbids corporate acquisitions that may lessen competition substantially or tend to create a monopoly. The appeals raise antitrust issues under section 7, primarily concerning the definition of the geographical market, and procedural and remedial issues under section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b). Section 13(b) authorizes the Commission to seek a preliminary injunction against the violation of a statute (such as section 7 of the Clayton Act) enforced by the Commission, pending administrative proceedings, and authorizes a federal district judge to grant the injunction "upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest."

Illinois Cereal Mills is a principal manufacturer of "industrial dry corn," a type of processed corn sold to manufacturers of corn flakes, corn bread, doughnuts, beer, and other food products. ICM's two mills are in Illinois and Indiana. On June 5 of last year it bought from Elders Grain the Lincoln Grain Company, which manufactures industrial dry corn at a mill in Atchison, Kansas. At the time, ICM and Lincoln were the second and fifth largest producers of industrial dry corn in the United States. The acquisition made ICM the largest, with a market share of 32 percent (up from 23 percent before the acquisition). There are only four other significant producers of industrial dry corn. The Commission learned on June 2 that the acquisition was scheduled to be consummated on June 7, and on June 3 it gave ICM and Elders written notice of its intention to challenge the acquisition and to seek rescission if the acquisition was consummated before an injunction could be obtained. ICM and Elders moved up the closing to June 5 (a

Sunday). The Commission filed suit the next day.

After a two-day evidentiary hearing, the district judge on June 24 issued a preliminary injunction that orders the transaction rescinded until the Commission concludes its administrative proceeding to determine whether the acquisition violated section 7. 691 F.Supp. 1131 (N.D.Ill.1988). The district judge has stayed the preliminary injunction pending appeal, but an order that he entered at the conclusion of the evidentiary hearing forbidding ICM to alter the operations of the Atchison mill remains in effect. The administrative proceeding before the FTC is in the pretrial discovery phase; the defendants have requested a year to complete discovery.

Section 13(b) of the Federal Trade Commission Act directs the district judge, in passing on a request by the FTC for an injunction pending administrative proceedings, to weigh the equities and determine the Commission's ultimate likelihood of success. Such a directive is rather empty without specification of how the evaluation of the equities and the evaluation of the merits (i.e., ultimate likelihood of success) are to be combined, a matter on which the scanty legislative history of section 13(b) is silent. The case law (also scanty) contains such statements as, "When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone would not suffice to justify denial of a preliminary injunction barring the merger." *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C.Cir.1981) (footnote omitted); see also *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984). No one could quarrel with this statement, which this court endorsed in an opinion issued several days after the oral argument in the present case, see *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028 (7th Cir.1988). But it may say less than it seems to say. While not giving *controlling* weight to "private equities"—of course not—the cases give them *some* weight; and the court in *Warner* quite properly observed that "private injuries are entitled to serious consideration." *Id.* In *World Travel* we interpreted the

previous cases to be saying that the FTC need not prove irreparable injury to obtain a preliminary injunction. It is not inconsistent with that interpretation to add that if the defendant can show irreparable injury to it from the grant of the injunction, then merits and harms must be evaluated in the usual way—to which we turn next.

■ In suits under antitrust statutes that are silent on the standard for granting or denying preliminary injunctions, we and other courts have used a "sliding scale" approach. See, e.g., *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir.1984); cf. *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1434 (7th Cir.1986). The greater the plaintiff's likelihood of success on the merits when those merits are ultimately determined after a full trial (in this case, after a full administrative proceeding before the FTC, followed by judicial review if the acquisition is held to violate section 7 and the parties to the acquisition petition for judicial review in one of the courts of appeals), the less harm from denial of the preliminary injunction the plaintiff need show in relation to the harm that the defendant will suffer if the preliminary injunction is granted. So, for example, if the balance of harms is even, the plaintiff is entitled to the injunction upon a showing that he has a better than 50 percent chance of winning. Given the desirability of having a uniform standard for preliminary injunctions in antitrust cases and perhaps in all cases, we believe that the *Roland* standard—the sliding-scale approach just sketched—is appropriate for requests for preliminary injunctions under section 13(b) of the FTC Act, in cases where defendants are able to show that a preliminary injunction would do them irreparable harm.

The district judge thought the FTC likely to succeed on the merits. He then weighed the harms in the balance, and the balance tipped against the acquisition. He thought, in fact, that the public interest in preventing an anticompetitive acquisition could not be outweighed by what he described as the defendants' purely private financial interests in completing the acquisition. By do-

ing this he collapsed the issue of equity or relative harm into the merits, for his view was that an anticompetitive acquisition is against the public interest and private interests can never trump public ones. This is not the best way to analyze the equities in an antitrust case or any other kind of case. First of all, public and private interests are not altogether distinct, since in many situations the public interest is merely the aggregation of private interests. Ours is not a society in which the state is normally assumed to have interests distinct from those of its citizens. The public interest in enforcing the antitrust laws is, in the main, the sum of the private interests of consumers in being able to buy goods and services at a competitive price. Of course, as the cases we cited earlier state, the pecuniary interests of the defendants should not be given controlling weight in deciding whether a preliminary injunction should be issued. However, what would be ignored by so truncated an inquiry into the effects of granting the injunction would not be a mystical or transcendent "public interest" but another set of pecuniary interests—those of the consumers who might be hurt by the challenged transaction.

It is always better to avoid relying on vague concepts and instead to ask concretely who would be helped and who hurt by a proposed action: here, who would be helped and who would be hurt by allowing —and who by forbidding—a challenged acquisition to go through before what are often protracted administrative proceedings are completed. In other words, what are the consequences of the alternative courses of action that the district judge might take? If the acquisition seems anticompetitive, then failing to stop it during the administrative proceedings will deprive consumers and suppliers of the benefits of competition *pendente lite* and perhaps forever, for it is difficult to undo a merger years after it has been consummated.

That difficulty is not merely theoretical in the present case. It is a speculative question whether several years from now, if the acquisition is held to violate section 7, Lincoln Grain Company will either be able to stand on its own or be attractive to a company from outside the industrial dry corn industry—for if it is sold to one of the four other firms in the industry, the number of competitors will be no greater than if the present acquisition is upheld, although concentration will be lower if the buyer is smaller than ICM. Elders, which is not a member of the industry, obtained Lincoln as part of a larger deal, and was eager to sell it. It is not likely to want to buy it back in several years. After several years of tutelage by ICM, even under the district court's freeze order entered on June 10 Lincoln may not be able to reenter the industry as a vigorous independent competitor. On the other side of the balance, the defendants argue forcefully that if the acquisition is rescinded it will never be renewed even if the defendants prevail in the FTC proceeding. Elders doesn't want to be in the industrial dry corn industry. It will sell Lincoln Grain Company to someone else, and the benefits of the acquisition will be lost. But what are those benefits? Here the defendants turn vague. They argued to the district judge that ICM plans to modify the operations of the Atchison plant in a number of particulars, but did not make a convincing showing that the modifications would result in a significant increase in output (which would of course benefit consumers).

The district judge was correct that in a section 13(b) proceeding the merits and equities are not completely separable, though they are not as inseparable as he thought. The merits depend to a great extent on the economic effects of the challenged acquisition; the equities depend to a great extent on the same thing. An acquisition that is procompetitive or that is likely to lead to lower prices via expansion of output through economies of scale or other efficiencies will benefit consumers, suppliers, and other economic players, and the benefits will be reduced (perhaps to zero) if the acquisition is enjoined or rescinded. An acquisition that is anticompetitive is likely to have the opposite effects (though occasionally these will be offset by lower costs, passed on to consumers in the form of lower prices), and those effects will be

magnified if the acquisition is allowed to go forward during the period of administrative challenge, especially if that period is so protracted as to defeat the prospects for effective divestiture at the end. Circumstances may cause the balance of equities to diverge from the merits—hence our earlier caution against collapsing the two inquiries—but such circumstances were not shown here. Here the balance could be assumed either to follow the merits or to be even. Either way the decision to grant or deny a preliminary injunction would turn on the likelihood that the acquisition really does violate section 7. So let us turn to that question.

■ If the market was correctly defined as the sale of industrial dry corn throughout the nation, there can be little doubt that the district judge was correct in finding that the Commission is likely to prevail on the merits. (We set to one side the cynical though perhaps realistic speculation that since the Commission is both the instigator and the trier of the cases filed before it, the decision to seek a preliminary injunction is a good predictor of the likely outcome of the administrative proceeding. There is always judicial review to curb any tendency of the Commission to succumb to the temptations implicit in its being, in a sense, a judge in its own cause. There is also rapid turnover among Commissioners.) The supply of industrial dry corn was already highly concentrated before the acquisition, with only six firms of any significance. The acquisition has reduced that number to five. This will make it easier for leading members of the industry to collude on price and output without committing a detectable violation of section 1 of the Sherman Act, 15 U.S.C. § 1, or section 5 of the FTC Act, 15 U.S.C. § 45, both of which forbid price-fixing. The penalties for price-fixing are now substantial, but they are brought into play only where sellers actually agree on price or output or other dimensions of competition; and if conditions are ripe, sellers may not have to communicate or otherwise collude overtly in order to coordinate their price and output decisions; at least they may not have to collude in a readily detectable manner.

Since there are no close substitutes for industrial dry corn, its sellers can raise price above competitive levels (i.e., above cost, defined as economists define it to include a reasonable profit) without immediately losing all or most of their sales to the makers of other products. The varieties of industrial dry corn (brewers' grits, corn meal, flaking grits, etc.) appear to be largely standardized and homogeneous, making it easier for sellers to agree on a common price to charge for them, if they are so minded. And since entry into the industry is slow—it takes three to nine years to design, build, and start operating a new mill—colluding sellers need not fear that any attempt to restrict output in order to drive up price will be promptly nullified by new production. Compare *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1335 (7th Cir.1986). It comes as no surprise that there is a history of efforts to fix prices in the industry—a history that predates the market structure even more prone to collusion that the challenged acquisition created.

Granted, the factors that make a market more or less amenable to being cartelized are not all on one side in this case. The buyers of industrial dry corn are a handful of large and sophisticated manufacturers of food products. A concentrated and knowledgeable buying side makes collusion by sellers more difficult. Colluders are tempted to cheat on their fellows when they can augment their profits by a single large sale (at a shade below the cartel price) that is unlikely to be detected. Knowing this, sophisticated buyers may be able to chivvy particular sellers for secret discounts, and the cumulative effect may be the collapse of the cartel. Another temptation to cheat in the industrial dry corn industry is the presence of excess capacity. It is estimated (roughly) to be 20 to 30 percent, and is concentrated apparently in the largest firms; Lincoln is said to have had little or no excess capacity. The existence of excess capacity implies that additional sales can be made at little additional cost, making them disproportionately

profitable. So colluding sellers who are plagued by excess capacity will be tempted to cheat by offering sales at a shade below the cartel price; these sales will still be highly profitable. But of course excess capacity may be a symptom of cartelization rather than a cure for it: when sellers collude, reducing output in order to drive up price, some of their existing capacity, geared as it was to a higher, competitive output, will become excess. Furthermore, excess capacity discourages new entry; who wants to enter a market plagued by excess capacity? It might have been better in this case if the parties had calculated market shares on the basis of capacity rather than output; that would be a way of reflecting the complex considerations that enter into an evaluation of the impact of excess capacity on the propensity to collude. But data on capacity are not in the record (it's just a guess that the industry has 20 to 30 percent excess capacity, and how it is distributed among the firms); and considering the haste with which the FTC was compelled to act by the defendants' decision to accelerate the acquisition, the Commission cannot be faulted for having failed to calculate market shares in capacity as well as output terms.

■ Section 7 forbids mergers and other acquisitions the effect of which "may" be to lessen competition substantially. A certainty, even a high probability, need not be shown. Of course the word "may" should not be taken literally, for if it were, every acquisition would be unlawful. But the statute requires a prediction, and doubts are to be resolved against the transaction. See, e.g., *United States v. Philadelphia National Bank*, 374 U.S. 321, 362–63, 83 S.Ct. 1715, 1740–41, 10 L.Ed.2d 915 (1963); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 555–58, 93 S.Ct. 1096, 1112–14, 35 L.Ed.2d 475 (1973). The theory of competition and monopoly that has been used to give concrete meaning to section 7 teaches that an acquisition which reduces the number of significant sellers in a market already highly concentrated and prone to collusion by reason of its history and circumstances is unlawful in the absence of special circumstances. See, e.g., *Hospital*

*Corp. of America v. FTC*, 807 F.2d 1381, 1389 (7th Cir.1986).

But all this assumes a properly defined market. The defendants point out that shipping costs are substantial, that their plants are in different parts of the country (ICM's is east of the Mississippi and Lincoln's west—and there is a surcharge for rail shipments that cross the river), and that they tend to sell different varieties of industrial dry corn to different customers. These points are not impressive. All of the nation's industrial dry corn mills are in a belt of states running from Indiana on the east to Kansas and Nebraska on the west. *All* of these mills, it appears, ship industrial dry corn into the nation's largest states, which include New York, Pennsylvania, Florida, and California. Lincoln's plant, located in Atchison, Kansas, ships to both the east and west coasts and to the southeastern tip of the country (Florida), while ICM's plant in Indiana ships its products more than 2,000 miles to California. It is true that there is a surcharge for shipping by rail across the Mississippi, but it is small and subject to negotiation (the Staggers Rail Act of 1980 has largely deregulated rail prices), and, despite it, Lincoln ships anywhere from 9 to 19 percent of its output east of the Mississippi, and ICM about 30 percent of its output west of the Mississippi. The Illinois plant of Bunge—the largest firm in the industry until ICM bought Lincoln—ships 61 percent of its output of flaking grits west of the Mississippi, while Bunge's Nebraska plant sells 61 percent of its output of other grits and meal east of the Mississippi. The defendants, valiantly striving to establish two markets, one east of the Mississippi and one west (so that ICM and Lincoln are not even competitors), have explanations for each and every shipment that has crossed the river—a special deal here, an emergency there—but the district judge was not required to believe this special pleading. The defendants and everyone else in their industry ship industrial dry corn all over the United States. If shipping costs were as high as the defendants say they are relative to price and profit, there would be mills closer to major

customers in California, Florida, and New York. The existence of excess capacity, by reducing the incremental cost of production to variable cost, enables mills to absorb substantial freight costs—and they do.

■ A market is the set of sellers to which a set of buyers can turn for supplies at existing or slightly higher prices. See *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *United States v. Philadelphia National Bank, supra,* 374 U.S. at 358–61, 83 S.Ct. at 1738–40. The size of the market is a function of price; other things remaining the same, a rise in price will expand the market by enabling more sellers to sell profitably to the customers in it. Buyers of industrial dry corn already scout the whole country for sources of supply; they would do so more avidly if sellers colluded. The challenged acquisition has eliminated an independent source of supply —a plant capable of selling anywhere in the country—to which customers might turn for succor if the other sellers tried to jack prices above the competitive level.

The argument that ICM and Lincoln are not in the same market because most of their customers are different and because the two firms don't sell the same product mix is based on a misunderstanding of competition. No market fits the economist's model of perfect competition—implying an infinite number of sellers having identical costs, a perfectly homogeneous product, and perfectly informed buyers—although some agricultural markets come close. In a normal market, sellers establish relations of mutual trust and advantage with particular customers, and the result is that at a given moment different sellers may have different customers. That doesn't mean the sellers are not competing. Customers aren't locked into these relationships; they can be lured away by a better offer. The possibility of such offers keeps the existing relationships from becoming exploitive.

■ The last issue is remedy. Apparently a district court has never ordered rescission in a proceeding under section 13(b). But the defendants concede as they must that the statutory grant of the power to issue a preliminary injunction carries with it the power to issue whatever ancillary equitable relief is necessary to the effective exercise of the granted power. Several cases so hold—including our recent *World Travel.* See *FTC v. World Travel Vacation Brokers, Inc., supra,* at 1026–27; *FTC v. U.S. Oil & Gas Corp.,* 748 F.2d 1431 (11th Cir.1984) (per curiam); *FTC v. H.N. Singer, Inc.,* 668 F.2d 1107, 1113 (9th Cir.1982); *FTC v. Southwest Sunsites, Inc.,* 665 F.2d 711, 718 (5th Cir.1982). The last two cases suggest in dicta that rescission is an authorized form of ancillary relief. The circumstances of the present case show how strange it would be to suppose that Congress meant to deny the district courts the power to rescind a transaction as a form of preliminary equitable relief. The Hart–Scott–Rodino Act, 15 U.S.C. § 18a, requires a firm the size of ICM to file a premerger notification of any acquisition of stock or assets for more than $15 million; after the notification there is a waiting period, during which the acquisition cannot be completed, to give the antitrust enforcement agencies a chance to determine the lawfulness of the transaction. To avoid having to file a premerger notification and observe the statutory waiting period, ICM and Elders, which had initially negotiated on the basis of a purchase price of $20 million or more for all the assets of Lincoln Grain Company, split Lincoln into two parts—the dry corn mill itself (and some associated assets) and the grain elevator attached to the mill and used to store the corn for milling. ICM paid $14 million for the mill and acquired an option to buy the grain elevator at any time in the next five years for $6 million. Having stolen one march on the Commission, the defendants stole another by accelerating the closing date for their deal in order to prevent the Commission from getting into court in time to seek a temporary restraining order. To reward these tactics by holding that a district court has no power under section 13(b) to rescind a consummated transaction would go far toward rendering the statute a dead letter. Some statutes are born dead, opponents having succeeded in blocking the enactment of a viable stat-

ute. There is no indication that this statute was meant to be a stillbirth. The judgment of the district court is

AFFIRMED.

RIPPLE, Circuit Judge, concurring.

I join the judgment of the court and in the essential reasoning of its opinion. I write separately only to emphasize that I do not read the court's opinion as diluting the importance of the merits of the government's underlying case in assessing a request for injunctive relief under section 13(b). A strong showing by the government that a violation of law has occurred necessarily produces "public equities" that must "receive far greater weight" than "private equities." *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1165 (9th Cir.1984) (per curiam). Of course, "private equities may be considered." *Id.* When the government's case is weak, the "public equities" will be less clear. Consequently, in such a case, "private equities" often will play a more dominant role in the analysis.